**From:** Shpresa Brahimi <SBrahimi@cornerstonegrp.us>
**Sent:** Thursday, October 2, 2025 3:59 PM
**To:** Claims
**Cc:** John Bures; Ted Kozerski
**Subject:** FW: Lawsuit - Professional Police Services dba Professional Security Service - DOL 4/12/25 - policy WSGL002339
**Attachments:** Daniels Lawsuit.pdf

Good afternoon,

Please log new claim and provide adjuster contact information once assigned ..

Thank you,

**Shpresa Brahimi | Underwriting Manager**
Cornerstone Underwriting Partners, LLC dba Venture Agency
DBA in CA: Cornerstone Partners Insurance Service, LLC
CA Agency License #0H16040
39999 Garfield Rd, Clinton Twp, MI 48038
B: 248.206.0901 | SBrahimi@cornerstonegrp.us

**STATE OF NORTH CAROLINA**

MECKLENBURG County

File No. 25CV048025-590

In The General Court Of Justice
☐ District ☒ Superior Court Division

| | |
|---|---|
| *Name Of Plaintiff*<br>Dwayne Pennant, Administrator of the Estate of Qualo Trevon Dan[is] | **CIVIL SUMMONS**<br>☐ **ALIAS AND PLURIES SUMMONS (ASSESS FEE)**<br>G.S. 1A-1, Rules 3 and 4 |
| *Address*<br>c/o Osborn Law, PLLC 712 W. Johnson St. Raleigh, NC 27603 | |
| *City, State, Zip*<br>Raleigh NC 27603 | |
| **VERSUS** | |
| *Name Of Defendant(s)*<br>City of Charlotte<br>Professional Police Services, Inc. | *Date Original Summons Issued*<br><br>*Date(s) Subsequent Summons(es) Issued* |

**To Each Of The Defendant(s) Named Below:**

| *Name And Address Of Defendant 1* | *Name And Address Of Defendant 2* |
|---|---|
| City of Charlotte<br>c/o Anthony Fox, City Attorney<br>600 East 4th Street<br>Charlotte NC 28202 | Professional Police Services, Inc.<br>c/o Jameson P. Wells, Registered Agent<br>910 East Boulevard, Suite 200<br>Charlotte NC 28203 |

**IMPORTANT! You have been sued! These papers are legal documents, DO NOT throw these papers out! You have to respond within 30 days. You may want to talk with a lawyer about your case as soon as possible, and, if needed, speak with someone who reads English and can translate these papers!**

**¡IMPORTANTE! ¡Se ha entablado un proceso civil en su contra! Estos papeles son documentos legales. ¡NO TIRE estos papeles!**
**Tiene que contestar a más tardar en 30 días. ¡Puede querer consultar con un abogado lo antes posible acerca de su caso y, de ser necesario, hablar con alguien que lea inglés y que pueda traducir estos documentos!**

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and
2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| | |
|---|---|
| *Name And Address Of Plaintiff's Attorney (if none, Address Of Plaintiff)*<br>Santiago Arroba<br>Justin M. Osborn<br>712 W. Johnson St.<br>Raleigh NC 27603 | *Date Issued* 9/15/2025 *Time* 8:09:07 am ☐ AM ☐ PM<br>*Signature* /s/ Mitchell Woodard<br>☐ *Deputy CSC* ☒ *Assistant CSC* ☐ *Clerk Of Superior Court* |

| | |
|---|---|
| ☐ ENDORSEMENT (ASSESS FEE)<br>This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | *Date Of Endorsement* *Time* ☐ AM ☐ PM<br>*Signature*<br>☐ *Deputy CSC* ☐ *Assistant CSC* ☐ *Clerk Of Superior Court* |

**NOTE TO PARTIES:** *Many counties have* ***MANDATORY ARBITRATION*** *programs in which most cases where the amount in controversy is $25,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

(Over)


© 2023 Administrative Office of the Courts

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
25 CVS ______

DWAYNE PENNANT, ADMINISTRATOR OF THE ESTATE OF QUALO TREVON DANIELS,

Plaintiff,

v.

CITY OF CHARLOTTE and PROFESSIONAL POLICE SERVICES INC.,

Defendants.

**COMPLAINT**

**(JURY TRIAL DEMANDED)**

Plaintiff Dwayne Pennant, Administrator of the Estate of Qualo Trevon Daniels, complaining of Defendants City of Charlotte and Professional Police Services, Inc., alleges and says:

**PARTIES**

1. Plaintiff Dwayne Pennant is an attorney and citizen and resident of Mecklenburg County, North Carolina. He has been retained by the family of Qualo Daniels to serve as administrator of his estate and was appointed by the Mecklenburg County Clerk of Court as Administrator of the Estate of Qualo Trevon Daniels. In that capacity, Mr. Pennant is authorized and is the proper party to bring this action on behalf of and for the benefit of the Estate of Qualo Trevon Daniels, Pursuant to N.C. Gen. Stat. 28A-18-1 *et seq.*

2. Defendant City of Charlotte is a local government existing by and defined by North Carolina General Statutes 160A-470(b). At all relevant times, upon information and belief, Defendant City of Charlotte has been a municipal corporation and a body politic and corporate. Defendant City of Charlotte operates a commercial transit system, commonly referred to as the Charlotte Area Transit System ("CATS"). The City of Charlotte operates CATS in the Charlotte and greater Mecklenburg County area for profit and for the transportation of passengers; it holds itself out to the public as engaged in the public business of transporting persons from place to place for a fee, and as such Defendant City of Charlotte through CATS is a common carrier.

3. At all times relevant to this action, Defendant Professional Police Services, Inc., a/k/a Professional Security Services (hereafter "Defendant Police Services") was a corporation duly organized and existing under the laws of the State of North Carolina and was registered to do business and was transacting business in Mecklenburg County, North Carolina. Defendant Police

Services registered agent for service of process is Jameson P. Wells, 910 East Blvd, Suite 200, Charlotte NC 28203-4855, Mecklenburg County.

## JURISDICTION AND VENUE

4. The Superior Court of the General Court of Justice has jurisdiction over this matter pursuant to N.C. Gen. Stat. § 7A-240, § 7A-243, § 42-44, and § 1-75.4

5. Venue lies in Mecklenburg County, North Carolina pursuant to N.C. Gen. Stat. § 1-79.

## FACTUAL BACKGROUND

6. The allegations contained in Paragraphs 1 through 5 are incorporated herein by reference as if fully set forth.

7. At all times relevant hereto, including on April 12, 2025, Defendant City of Charlotte operated CATS, and owned, operated, managed, supervised, inspected, controlled, and/or maintained as CATS' center of operation a transit terminal known as "Charlotte Transportation Center" (hereinafter the CTC) located in downtown Charlotte at 310 E Trade St, Charlotte, North Carolina 28202.

8. Defendant City of Charlotte operates CATS out of the CTC in the Charlotte and the greater Mecklenburg County area for profit.

9. For the benefit of CATS passengers, Defendant City of Charlotte leases spaces to multiple tenants in the CTC, including fast food vendors; as such, the City of Charlotte holds itself out to the public as engaged in the public business as a commercial landlord.

10. At all relevant times, Defendant City of Charlotte, upon information and belief, has waived immunity by virtue of the purchase of insurance pursuant to the provisions of N.C. Gen. Stat. § 160A-485.

11. In the alternative, or in addition thereto, Defendant City of Charlotte has waived immunity by virtue of the fact that both its operation of a bus transportation system for profit and its operation of the CTC as a landlord are proprietary activities and not governmental functions, in that: (a) the legislature has not specifically described the operation of a transit bus system or the operation of acting as a landlord as a governmental activity; (b) the operation of a transit bus system is or that of acting as a landlord not something that only a government can do; (c) the operation of a transit bus system or that of acting as a landlord is one not traditionally provided by a governmental entity; (d) the City of Charlotte receives fees, charges for its bus service and collects rent from its tenants; and (e) upon information and belief, the fees, charges, and collected rents more than cover the operating costs of the services provided.

12. Upon information and belief, Defendant City of Charlotte hired Defendant Police Services pursuant to a contract that was entered into on July 15, 2023, and this contract remained in force on April 12, 2025.

13. Pursuant to the contract, Defendant Police Services was to provide security services as follows:

> "The security services under this contract will be used to protect CATS properties, which include at a minimum the following areas of CATS operations: revenue buses; revenue collection; transit facilities and assets, including the entire Blue Line (light rail) and Gold Line (streetcar) and future systems consisting of vehicles, station platforms; access areas; park-n-rides and garage facilities; CATS Bus Transit Centers with particular emphasis on the Charlotte Transportation Center (CTC) and other CATS' facilities (See Section 3.3-H, "Site Specific Requirements").

14. At all times relevant hereto, including on April 12, 2025, Defendant City of Charlotte had the right to enter the CTC to inspect and monitor the premises for hazardous, dangerous, or unsafe conditions and to ensure the building it owned was operated safely for customers, guests, and invitees, including members of the general public.

15. At all times relevant hereto, including on April 12, 2025, Defendant City of Charlotte was responsible for the upkeep, security, and maintenance of the CTC.

16. At all times hereto, including on April 12, 2025, Defendant Police Services was responsible for providing "high quality security services to maintain a safe operating environment for CATS employees and passengers."

17. At all times relevant hereto, including on April 12, 2025, Defendants City of Charlotte and Police Services were responsible for keeping the CTC Station in a safe condition.

18. At all times relevant hereto, including on April 12, 2025, Defendants City of Charlotte and Police Services were responsible for not creating hazardous, dangerous, and/or unsafe conditions at the CTC Station.

19. At all times relevant hereto, including on April 12, 2025, Defendants City of Charlotte and Police Services were responsible for correcting, remedying, or eliminating hazardous, dangerous, and/or unsafe conditions at the CTC.

20. At all times relevant hereto, including on April 12, 2025, Defendants City of Charlotte and Police Services were responsible for not creating a ruinous condition or state of nuisance at the CTC.

21. At all times relevant hereto, including on April 12, 2025, Defendants City of Charlotte and Police Services were responsible for correcting, remedying, or eliminating ruinous conditions and nuisances at the CTC.

22. At all times relevant hereto, including on April 12, 2025, Defendants City of Charlotte and Police Services were responsible for protecting lawful visitors, including Qualo, from reasonably foreseeable criminal attacks at the CTC.

23. At all times relevant hereto, including on April 12, 2025, Defendants City of Charlotte and Police Services were responsible for keeping the CTC in a state consistent with the due regard of the safety of customers, patrons, and invitees at the CTC, including Qualo.

24. At all times relevant hereto, including on April 12, 2025, Defendants City of Charlotte and Police Services were responsible for reasonably protecting lawful visitors, including Qualo, from foreseeable criminal activity that was likely to endanger the safety of lawful visitors, including Qualo, at the CTC.

25. At all times relevant hereto, including on April 12, 2025, Defendants City of Charlotte and Police Services were responsible for exercising reasonable care to discover criminal activity at the CTC and to reasonably prevent or control such criminal activity upon its discovery.

26. At all times relevant hereto, including on April 12, 2025, Defendants City of Charlotte and Police Services each had the following non-delegable duties relating to the CTC:

a. to not create hazardous, dangerous, or unsafe conditions;

b. to not expose lawful visitors to hazardous, dangerous, or unsafe conditions;

c. to identify hazardous, dangerous, or unsafe conditions;

d. to supervise the CTC to ensure the safety of lawful visitors;

e. to protect lawful visitors from hazardous, dangerous, or unsafe conditions and criminal activity;

f. to correct hazardous, dangerous, or unsafe conditions;

g. to prevent criminal activity on the premises;

h. to mitigate hazardous, dangerous, or unsafe conditions;

i. to control and manage the CTC in such a manner that it remained safe for customers and lawful visitors;

j. to provide customers and lawful visitors with a safe place to take buses or shop.

27. Upon information and belief, the CTC has been in operation since December of 1995, its business hours are 4:50 a.m. to 1:30 a.m.

28. The CTC houses multiple tenants of Defendant City of Charlotte such as Bojangles, Burger King, China Shuttle, Lil' Orbitz, Plaza Sundries, and Subway, among others.

29. Since its opening and prior to Qualo's killing on April 12, 2025, the CTC was the site of numerous instances of criminal activity.

30. According to news reports by WCNC News and other news outlets, all vendors operating inside the CTC will be forced to shut down due to safety concerns in an effort to create

and enforce a "fare zone" to allow CATS employees to ask people without tickets or passes to vacate the premises.

31. According to an article by the Charlotte Observer, since January 2024, passengers and visitors of the CTC experienced:

a. Multiple reported assaults;

b. 8 aggravated assaults, four of which involved a knife;

c. 3 armed robberies;

d. 4 strong-arm robberies;

e. 22 thefts

32. According to news reports by WCNC News and other news outlets, since December of 2024, there have been three other homicide deaths at or around the CTC prior to Qualo's slaying, including:

a. December 8, 2024: Joshua Overton, a civilian killed by CATS retained security guards;

b. February 20, 2025: Leshean McBeth, who was robbed then stabbed in the neck and killed at the CTC; and

c. February 24, 2025: An unnamed woman was found dead in a lobby bathroom of the CTC

33. According to CMPD CrimeMapper, a third-party application developed in conjunction with the City of Charlotte and CMPD to "assist police departments in reducing crime through a better-informed citizenry," since April of 2015, the following violent crimes have occurred within a 100-*foot* radius of the CTC:

a. 1,285 Aggravated Assaults;

b. 1,698 Burglaries;

c. 1,998 Drug/Narcotics Violations;

d. 36 Homicides;

e. 4,973 Larcenies from Vehicle;

f. 3,141 Motor Vehicle Thefts;

g. 510 Robberies;

h. 7,143 Thefts/Larcenies;

i. 517 Weapon Law Violations

34. At all relevant times, the CTC was located 360 steps from the CMPD Headquarters.

35. At all times relevant hereto, including on April 12, 2025, Defendants City of Charlotte and Police Services knew or should have known that the CTC was regularly and repeatedly the site of criminal activity, was in a ruinous condition, and was in a state of nuisance.

36. Upon information and belief, in addition to Defendant Police Services, Defendant City of Charlotte, through the CMPD, also deployed and assigned a number of transit-dedicated CMPD offers to the CTC.

37. As a result, Defendant City of Charlotte had direct and regular knowledge of the disturbances, violence, and other illegal activity that emanates in and around the CTC and affects passengers and visitors to that area of the city.

38. Defendant City of Charlotte, by and through its CATS transit authority, holds and publicizes CATS as a safe, effective and efficient means of daily transportation and makes promises to the community regarding the safety of the CATS system.

39. Instead of upholding this promise, Defendant City of Charlotte continued to operate and profit from the enterprise operating at its commercial property without regard to the unreasonable and foreseeable risks presented to occupants, customers, and the public at large.

40. In light of the noteworthy volume of police calls and responses to incidents taking place at the CTC in the relevant time period leading up to Qualo's killing, Defendants City of Charlotte and Police Services knew or should have known of the importance of ensuring that those hired, employed, or retained to provide security at the CTC were adequately trained on preventing violence and deescalating conflict.

41. Defendants City of Charlotte and Police Services did not warn Qualo or members of the public of the known dangers and illicit activity, including violent crimes, regularly occurring at the CTC.

42. Defendants City of Charlotte and Police Services did not warn Qualo or members of the public that passengers and visitors to the CTC were regularly the victims of violent crimes.

43. Prior to Qualo's death, Defendants City of Charlotte and Police Service knew of the risks associated with illicit activity and violent crimes regularly occurring at the CTC, including the risk of serious injuries and death of passengers and visitors to the CTC.

44. Prior to Qualo's death, Defendants City of Charlotte and Police Services knew or should have known that mitigation efforts and attempts to stop rampant illicit activity and violent crime at the CTC were woefully inadequate, including the deaths of three other passengers and visitors to the CTC in less than six months prior to Qualo's killing.

45. Prior to Qualo's death, Defendant City of Charlotte was aware and on notice of numerous police calls from passengers and visitors to the CTC reporting illicit activity and violent

crime at the CTC in addition to the onsite observations of Defendant Police Services and assigned members of the CMPD.

46. Prior to Qualo's death, Defendants City of Charlotte and Police Services had the opportunity, time, and ability to employ violent crime mitigation efforts at the CTC to protect the public, passengers, and visitors to the area, including Qualo, but failed to do so.

47. In the alternative, prior to Qualo's death, Defendants City of Charlotte and Police Services had the opportunity, time, and ability to warn the public, passengers, and visitors to the CTC, including Qualo, that they had lost control of the CTC to violent criminals, but failed to do so.

## INCIDENT

48. On Saturday, April 12, 2025, at approximately 10 p.m., Qualo Daniels was a lawful patron and visitor to the CTC.

49. Qualo arrived at the CTC to eat at the Defendant City of Charlotte managed and leased food court before meeting up with friends to go out in Charlotte to celebrate a birthday.

50. At the same time, violent perpetrators Jeremiah Deshawn McCree and Deion Marquise Futrell were also present at the CTC.

51. Upon information and belief, Jeremiah Deshawn McCree had a prior violent criminal record, including a recent arrest for pointing a firearm at a student in Horry County, South Carolina on February 27, 2024.

52. Upon information and belief, Deion Marquise Futrell also had a prior violent criminal record and was recently arrested for possession of marijuana on February 22, 2024.

53. Upon information and belief, shortly after 10:20pm, an altercation between McCree and Futrell broke out.

54. During the physical altercation between these violent criminals, Defendants City of Charlotte and Police Services and their agents and employees, including CATS employees and transit dedicated CMPD officers on site, all failed to intervene and remove Futrell and McCree before the fight escalated.

55. With no intervention or deterrence by Defendants City of Charlotte and Police Services, the fight between Mcree and Futrell escalated into a gunfight.

56. Upon information and belief, McCree shot first at Futrell, who in turn shot back in "self-defense" according to CMPD.

57. Futrell's errant "self-defense" gunshot struck Qualo in the head, causing fatal injuries. Qualo was a bystander and was not involved in the altercation.

58. As the obvious, natural, and foreseeable consequence of Defendants City of Charlotte and Police Services' negligent security, and the other acts and/or omissions of Defendants alleged further herein, Qualo suffered serious, painful injuries and then died from those injuries.

59. On April 16, 2025, the CMPD Violent Criminal Apprehension Team arrested Jeremiah Deshawn McCree and charged him Attempted 1st degree murder of Futrell, as well as with Assault with a Deadly Weapon with Intent to Kill and Possession of a Firearm by a Convicted Felon.

60. On April 28, 2025, a Grand Jury indicted McCree for Attempted First Degree Murder, AWDWIK, and Possession of a Firearm by Felon.

61. On May 30, 2025, after four deaths in less than five months, Defendant City of Charlotte announced it was shutting down all businesses at the CTC by terminating their leases within 90-days in an effort to curb violence.

## FIRST CLAIM: WRONGFUL DEATH BASED ON NEGLIGENCE
**(All Defendants)**

62. The allegations contained in Paragraphs 1 through 61 are incorporated herein by reference as if fully set forth.

63. On April 12, 2025, Qualo Daniels was at the Premises with the express and/or implied permission of Defendants and was a lawful visitor as defined by law.

64. At all times relevant, Defendants were in exclusive possession and control of the Premises, including being responsible for inspecting, maintaining, monitoring, securing, patrolling and surveilling the Premises to ensure the lives, health, and safety of others.

65. At all times relevant, Defendants owed a non-delegable duty of care, including to Plaintiff, to exercise due caution and circumspection with due regard for the rights and safety of others in such a manner as would not endanger or be likely to endanger the lives, health, or safety of others.

66. At all relevant times, prior to and including April 12, 2025, Defendants knew or should have known that customers and lawful visitors of the CTC were subjected to an unreasonable and foreseeable risk of criminal activity that was likely to endanger the safety of said customers and visitors.

67. Prior to and on April 12, 2025, despite knowing the CTC was regularly and repeatedly the site of criminal activity and despite knowing that customers and lawful visitors of the CTC were subjected to an unreasonable and foreseeable risk of criminal activity that was likely to endanger the safety of said customers and visitors, Defendants City of Charlotte and Police Services took no reasonable steps to prevent or control such criminal activity and to protect their customers and lawful visitors.

68. Defendants are liable for the acts and omissions of their officers, directors, managers, members, employees, and/or agents under the doctrine of *respondeat superior*.

69. Defendants, acting by and through their officers, directors, managers, members, employees, and/or agents (actual or apparent), including but not limited to the CMPD, were negligent in that they failed to exercise due caution and circumspection with due regard for the rights and safety of others in such a manner as would not endanger or be likely to endanger the lives, health, or safety of others.

70. Defendants above-described negligence directly and proximately caused Qualo to die unnecessarily.

71. As a result, Mr. Pennant, on behalf of the Estate of Qualo Daniels, is entitled to recover the following damages under N.C. Gen. Stat. § 28A-18-2(b):

a. expenses for care, treatment, and hospitalization incident to the injuries resulting in Qualo's death;

b. compensation for Qualo's pain and suffering;

c. the reasonable funeral expenses for Qualo; and

d. the monetary value of Qualo to the persons entitled to receive the damages recovered, including but not limited to compensation for the loss of the reasonably expected:

    i. services, protection, care, and assistance of Qualo; and

    ii. society, companionship, comfort, guidance, kindly offices, and advice of Qualo.

72. As a result of the negligence of the Defendants, Mr. Pennant is entitled to recover compensatory damages in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00) to be determined at trial for the wrongful death of Qualo Trevon Daniels.

## SECOND CLAIM: WRONGFUL DEATH BASED ON NEGLIGENT HIRING AND SUPERVISION
**(Against Defendant City of Charlotte)**

73. The allegations contained in Paragraphs 1 through 72 are incorporated herein by reference as if fully set forth.

74. As the owner, landlord, and operator of the CTC, which was open to the public and offering public transportation, a food court, and other vendors, Defendant City of Charlotte owed to its customers, patrons, and visitors duties to provide a safe environment through adequate supervision.

75. As the owner, landlord, and operator of the CTC, which was open to the public and offering public transportation, a food court, and other vendors, Defendant City of Charlotte owed to its customers, patrons, and visitors duties to reasonably supervise its employees, agents, and retained security personnel—including Defendant Police Services and its employees, agents, and retained security personnel—responsible for providing security services to the CTC.

76. As the owner, landlord, and operator of the CTC, which was open to the public and offering public transportation, a food court, and other vendors, Defendant City of Charlotte owed to its customers, patrons, and visitors duties to exercise the degree of care, caution, diligence, and foresight exercised by and expected of a reasonable owner, landlord, and operator of a public transit hub like the CTC under the same or similar circumstances when supervising its employees, agents, and security personnel to prevent foreseeable harm to its customers, patrons, and visitors, including but not limited to injuries related to criminal activity.

77. Defendant City of Charlotte knew that negligently trained and supervised employees, agents, and retained security personnel in a public transit hub like the CTC would subject customers, patrons, and visitors of the CTC, like Qualo Daniels, to an unreasonable risk of harm.

78. Defendant City of Charlotte, acting by and through its officers, directors, members, employees, servants, and/or agents (actual or apparent), including but not limited to the CMPD and Defendant Police Services, were negligent for:

a. Failing to properly hire, train, and supervise its employees, agents, and/or assigns on how to properly identify and remove known violent criminals from its premises;

b. Failing to properly hire, train, and supervise its employees, agents, and/or assigns on how to properly deescalate conflict;

c. Failing to properly hire, train, and supervise its employees to monitor and enforce the use of adequate security techniques to ensure the safety of visitors, customers, and patrons in a space like the CTC;

d. Failing to properly conduct meaningful, thorough, and/or comprehensive background checks to ensure the CTC was being entrusted to responsible people;

e. Failing to meaningfully, effectively, and comprehensively research and screen people for potential red flags and to assess and ensure they would be safe and responsible people to manage and supervise the CTC;

f. Failing to ensure its employees, agents, and/or assigns created a safe zone at the CTC by deterring criminal activity;

g. Failing to adequately staff its facility with a sufficient number of qualified and properly trained employees, agents, and/or assigns in order to ensure people who were unsafe, reckless, and/or likely to cause injury to others were

identified, arrested, or otherwise removed to ensure they were not present at the CTC; and,

h. Other negligent acts or omissions to be determined.

79. Defendant City of Charlotte above-described negligence directly and proximately caused Qualo's death, and as a result, Mr. Pennant, on behalf of the Estate of Qualo Daniels, is entitled to recover the following damages under N.C. Gen. Stat. § 28A-18-2(b):

a. expenses for care, treatment, and hospitalization incident to the injuries resulting in Qualo's death;

b. compensation for Qualo's pain and suffering;

c. the reasonable funeral expenses for Qualo; and

d. the monetary value of Qualo to the persons entitled to receive the damages recovered, including but not limited to compensation for the loss of the reasonably expected:

   i. services, protection, care, and assistance of Qualo; and

   ii. society, companionship, comfort, guidance, kindly offices, and advice of Qualo.

80. As a result of the negligence of Defendant City of Charlotte, Mr. Pennant is entitled to recover compensatory damages in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00) to be determined at trial for the wrongful death of Qualo Trevon Daniels.

## THIRD CLAIM: WRONGFUL DEATH BASED ON NEGLIGENT HIRING AND SUPERVISION

**(Against Defendant Police Services)**

81. The allegations contained in Paragraphs 1 through 80 are incorporated herein by reference as if fully set forth.

82. As the security company retained to provide security for the CTC, which was open to the public and offered public transportation, a food court, and other vendors, Defendant Police Services owed to customers, patrons, and visitors of the CTC duties to provide a safe environment through adequate supervision.

83. As the security company retained to provide security for the CTC, which was open to the public and offered public transportation, a food court, and other vendors, Defendant Police Services owed to customers, patrons, and visitors of the CTC duties to reasonably supervise its employees, agents, and retained security personnel that were responsible for providing security services to the CTC.

84. As the security company retained to provide security for the CTC, which was open to the public and offered public transportation, a food court, and other vendors, Defendant Police Services owed the customers, patrons, and visitors of the CTC duties to exercise the degree of care, caution, diligence, and foresight exercised by and expected of a reasonable security services company to a public transit hub like the CTC under the same or similar circumstances when supervising its employees, agents, and security personnel to prevent foreseeable harm to its customers, patrons, and visitors, including but not limited to injuries related to criminal activity.

85. Defendant Police Services knew that negligently trained and supervised employees, agents, and/or assigns in a public transit hub like the CTC would subject customers, patrons, and visitors of the CTC, like Qualo Daniels, to an unreasonable risk of harm.

86. Defendant Police Services, acting by and through its officers, directors, members, employees, servants, and/or agents (actual or apparent), including but not limited to the CMPD and Defendant City of Charlotte, were negligent for:

a. Failing to properly hire, train, and supervise its employees, agents, and/or assigns on how to properly identify and remove known violent criminals from its premises;

b. Failing to properly hire, train, and supervise its employees, agents, and/or assigns on how to properly deescalate conflict;

c. Failing to properly hire, train, and supervise its employees to monitor and enforce the use of adequate security techniques to ensure the safety of visitors, customers, and patrons in a space like the CTC;

d. Failing to properly conduct meaningful, thorough, and/or comprehensive background checks to ensure the CTC was being entrusted to responsible people;

e. Failing to meaningfully, effectively, and comprehensively research and screen people for potential red flags and to assess and ensure they would be safe and responsible people to manage and supervise the CTC;

f. Failing to ensure its employees, agents, and/or assigns created a safe zone at the CTC by deterring criminal activity;

g. Failing to adequately staff its facility with a sufficient number of qualified and properly trained employees, agents, and/or assigns in order to ensure people who were unsafe, reckless, and/or likely to cause injury to others were identified, arrested, or otherwise removed to ensure they were not present at the CTC; and,

h. Other negligent acts or omissions to be determined.

87. Defendant Police Services' above-described negligence directly and proximately caused Qualo's death, and as a result, Mr. Pennant, on behalf of the Estate of Qualo Daniels, is entitled to recover the following damages under N.C. Gen. Stat. § 28A-18-2(b):

a. expenses for care, treatment, and hospitalization incident to the injuries resulting in Qualo's death;

b. compensation for Qualo's pain and suffering;

c. the reasonable funeral expenses for Qualo; and

d. the monetary value of Qualo to the persons entitled to receive the damages recovered, including but not limited to compensation for the loss of the reasonably expected:

   i. services, protection, care, and assistance of Qualo; and

   ii. society, companionship, comfort, guidance, kindly offices, and advice of Qualo.

88. As a result of the negligence of Defendant Police Services, Mr. Pennant is entitled to recover compensatory damages in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00) to be determined at trial for the wrongful death of Qualo Trevon Daniels.

**FOURTH CLAIM: WRONGFUL DEATH BASED ON NEGLIGENT SECURITY AND HAZARDOUS CONDITIONS**
**(All Defendants)**

89. The allegations contained in Paragraphs 1 through 88 are incorporated herein by reference as if fully set forth.

90. Defendants, acting by and through their officers, directors, members, employees, servants, and/or agents (actual or apparent), including but not limited to the CMPD, were negligent in that they:

a. failed to provide proper security for the CTC;

b. failed to inspect the premises for hazardous, dangerous, or unsafe conditions;

c. failed to provide adequate upkeep, security, and maintenance of the CTC;

d. failed to keep the CTC in a safe condition;

e. created hazardous, dangerous, and unsafe conditions at the CTC;

f. failed to correct, remedy, and eliminate hazardous, dangerous, and/or unsafe conditions at the CTC;

g. created a ruinous condition and state of nuisance at the CTC;

h. failed to correct, remedy, and eliminate ruinous conditions and nuisances at the CTC;

i. failed to protect lawful patrons, visitors, or other members of the general public, including Qualo, from reasonably foreseeable criminal attacks;

j. failed to keep the CTC in a state consistent with the due regard of the safety of their invitees, including Qualo;

k. failed to protect lawful patrons, visitors, or other members of the general public, including Qualo, from foreseeable criminal activity that was likely to endanger the safety of such persons, including Qualo, at the CTC;

l. failed to exercise reasonable care to discover criminal activity at the CTC and to reasonably prevent or control such criminal activity upon its discovery;

m. turned a blind eye to the regular criminal activity at and near the CTC;

n. breached their non-delegable duties by:

    i. creating hazardous, dangerous, or unsafe conditions;

    ii. exposing customers and lawful patrons, visitors, or other members of the general public, to hazardous, dangerous, or unsafe conditions;

    iii. failing to identify hazardous, dangerous, or unsafe conditions;

    iv. failing to supervise the CTC to ensure the safety of customers and lawful patrons, visitors, or other members of the general public;

    v. failing to protect customers and lawful patrons, visitors, or other members of the general public from hazardous, dangerous, or unsafe conditions and criminal activity;

    vi. failing to correct hazardous, dangerous, or unsafe conditions;

    vii. failing to prevent criminal activity on the premises;

    viii. failing to mitigate hazardous, dangerous, or unsafe conditions;

    ix. failing to control and manage the CTC in such a manner that it remained safe for customers and lawful patrons, visitors, or other members of the general public; and

    x. failing to provide customers and patrons, visitors, or other members of the general public with a safe space at the CTC;

o. otherwise failed to act reasonably under the circumstances; and

p. otherwise acted negligently, willfully, and/or wantonly as will be established during discovery and at trial.

91. Defendants' above-described negligence directly and proximately caused Qualo's death, and as a result, Mr. Pennant, on behalf of the Estate of Qualo Daniels, is entitled to recover the following damages under N.C. Gen. Stat. § 28A-18-2(b):

a. expenses for care, treatment, and hospitalization incident to the injuries resulting in Qualo's death;

b. compensation for Qualo's pain and suffering;

c. the reasonable funeral expenses for Qualo; and

d. the monetary value of Qualo to the persons entitled to receive the damages recovered, including but not limited to compensation for the loss of the reasonably expected:

i. services, protection, care, and assistance of Qualo; and

ii. society, companionship, comfort, guidance, kindly offices, and advice of Qualo.

92. As a result of the negligence of the Defendants, Mr. Pennant is entitled to recover compensatory damages in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00) to be determined at trial for the wrongful death of Qualo Trevon Daniels.

**FIFTH CLAIM: GROSS NEGLIGENCE**
**(All Defendants)**

93. The allegations contained in Paragraphs 1 through 92 are incorporated herein by reference as if fully set forth.

94. At all times relevant, Defendants owed a non-delegable duty of care, including to Qualo, to exercise due caution and circumspection with due regard for the rights and safety of others in such a manner as would not endanger or be likely to endanger the lives, health, or safety of others, including Qualo.

95. At all relevant times, prior to and including April 12, 2025, Defendants knew or should have known that customers and lawful visitors of the CTC, including Qualo, were subjected to an unreasonable and foreseeable risk of criminal activity that was likely to endanger the safety of said customers and visitors, including Qualo.

96. Prior to and on April 12, 2025, despite knowing the CTC was regularly and repeatedly the site of criminal activity and despite knowing that customers and lawful visitors of the CTC were subjected to an unreasonable and foreseeable risk of criminal activity that was likely to endanger the safety of said customers and visitors, Defendants City of Charlotte and Police

Services took no steps to prevent or control such criminal activity and to protect their customers and lawful visitors, including Qualo.

97. Defendants are liable for the acts and omissions of their officers, directors, managers, members, employees, and/or agents under the doctrine of respondeat superior.

98. Defendants, acting by and through their officers, directors, managers, members, employees, and/or agents (actual or apparent), including but not limited to the CMPD, consciously disregarded the rights and safety of Qualo when they engaged in the following willful and wanton conduct, including:

a. Failing to properly identify hazardous, dangerous, or unsafe conditions;

b. Creating hazardous, dangerous, or unsafe conditions;

c. Failing to correct known hazardous, dangerous, or unsafe conditions;

d. Exposing lawful visitors, including Qualo, to hazardous, dangerous, or unsafe conditions;

e. Failing to properly supervise the CTC to ensure the safety of lawful visitors, including Qualo;

f. Failing to utilize industry standard security measures to ensure the safety of lawful visitors, including Qualo;

g. Failing to protect lawful visitors, including Qualo, from hazardous, dangerous, or unsafe conditions and criminal activity;

h. Failing to prevent criminal activity on the premises;

i. Failing to control and manage the CTC in such a manner that it remained safe for customers and lawful visitors;

j. Failing to provide customers and lawful visitors, including Qualo, with a safe space to take buses or shop;

k. Failing to abide by industry standards for securing a large public transit hub like the CTC;

l. Failing to adequately staff its facility with a sufficient number of qualified and properly trained employees, agents, or representatives in order to deter and prevent crime;

m. Failing to adequately staff its facility with a sufficient number of qualified and properly trained employees, agents, or representatives that were capable to cause safety and security practices to be created, implemented, and enforced; and

n. Other grossly negligent acts or omissions to be determined.

99. Defendants' grossly negligent conduct was done purposely and with knowledge that it was in conscious disregard of the safety of customers, patrons and visitors upon the Premises, including Qualo.

100. Defendants above-described wanton and willful conduct directly and proximately caused Qualo to die unnecessarily.

101. As a result of the Defendants' gross negligence, Mr. Pennant, on behalf of the Estate of Qualo Daniels, is entitled to recover such actual and punitive damages from the Defendants in an amount to be determined at trial.

102. Plaintiff Dwayne Pennant, on behalf of the Estate of Qualo Daniels, is entitled to recover punitive damages from Defendants in an amount to be determined by a jury.

**SIXTH CLAIM: SURVIVAL ACTION**
**(All Defendants)**

103. The allegations contained in Paragraphs 1 through 102 are incorporated herein by reference as if fully set forth.

104. At all times relevant, Defendants owed a non-delegable duty of care, including to Plaintiff, to exercise due caution and circumspection with due regard for the rights and safety of others in such a manner as would not endanger or be likely to endanger the lives, health, or safety of others.

105. At all relevant times, prior to and including April 12, 2025, Defendants knew or should have known that customers and lawful visitors of the CTC were subjected to an unreasonable and foreseeable risk of criminal activity that was likely to endanger the safety of said customers and visitors.

106. Prior to and on April 12, 2025, despite knowing the CTC was regularly and repeatedly the site of criminal activity and despite knowing that customers and lawful visitors of the CTC were subjected to an unreasonable and foreseeable risk of criminal activity that was likely to endanger the safety of said customers and visitors, Defendants City of Charlotte and Police Services took no steps to prevent or control such criminal activity and to protect their customers and lawful visitors.

107. Defendants are liable for the acts and omissions of their officers, directors, managers, members, employees, and/or agents under the doctrine of *respondeat superior*.

108. Defendants, acting by and through their officers, directors, managers, members, employees, and/or agents (actual or apparent), including but not limited to the CMPD, were negligent in that they failed to exercise due caution and circumspection with due regard for the rights and safety of others in such a manner as would not endanger or be likely to endanger the lives, health, or safety of others.

109. Defendants above-described negligence directly and proximately caused Qualo to die unnecessarily.

110. Defendants, acting by and through their officers, directors, managers, members, employees, and/or agents (actual or apparent), including but not limited to the CMPD, consciously disregarded the rights and safety of Qualo when they engaged in the following willful and wanton conduct, including:

a. Failing to properly identify hazardous, dangerous, or unsafe conditions;

b. Creating hazardous, dangerous, or unsafe conditions;

c. Failing to correct known hazardous, dangerous, or unsafe conditions;

d. Exposing lawful visitors, including Qualo, to hazardous, dangerous, or unsafe conditions;

e. Failing to properly supervise the CTC to ensure the safety of lawful visitors, including Qualo;

f. Failing to utilize industry standard security measures to ensure the safety of lawful visitors, including Qualo;

g. Failing to protect lawful visitors, including Qualo, from hazardous, dangerous, or unsafe conditions and criminal activity;

h. Failing to prevent criminal activity on the premises;

i. Failing to control and manage the CTC in such a manner that it remained safe for customers and lawful visitors;

j. Failing to provide customers and lawful visitors, including Qualo, with a safe space to take buses or shop;

k. Failing to abide by industry standards for securing a large public transit hub like the CTC;

l. Failing to adequately staff its facility with a sufficient number of qualified and properly trained employees, agents, or representatives in order to deter and prevent crime;

m. Failing to adequately staff its facility with a sufficient number of qualified and properly trained employees, agents, or representatives that were capable to cause safety and security practices to be created, implemented, and enforced; and

n. Other grossly negligent acts or omissions to be determined.

111. Defendants' grossly negligent conduct was done purposely and with knowledge that it was in conscious disregard of the safety of customers, patrons and visitors upon the Premises, including Qualo.

112. Defendants above-described wanton and willful conduct directly and proximately caused Qualo to die unnecessarily.

113. Had Qualo lived, he would have been entitled to bring a personal injury action against Defendants.

114. Pursuant to N.C. Gen. Stat. § 28A-18-1, Mr. Pennant, as the Administrator of the Estate of Qualo Daniels, has the right to prosecute a personal injury action against Defendants on Qualo's behalf.

115. As the direct and proximate result of Defendants' negligence, gross negligence, negligent security, hazardous conditions, negligent hiring, retention and supervision, and willful and wanton conduct as alleged hereinabove, Qualo suffered serious and permanent injuries, incurred medical and hospital expenses, suffered excruciating pain, discomfort, and mental anguish, and suffered disfigurement.

116. As the direct and proximate result of Defendants' negligence, gross negligence, willful conduct, and/or wanton conduct, as alleged hereinabove, Mr. Pennant is entitled to recover damages in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00) for the personal injuries suffered by Qualo.

## SEVENTH CLAIM: UNFAIR AND DECEPTIVE TRADE PRACTICES
**(Against Defendant City of Charlotte)**

117. The allegations contained in Paragraphs 1 through 116 are incorporated herein by reference as if fully set forth.

118. Defendant City of Charlotte's wrongful acts and omissions are set forth herein were in commerce in that they involved a business activity and the day-to-day activities and affairs of CATS, the CTC, and the City of Charlotte in Mecklenburg County, North Carolina.

119. Defendant City of Charlotte's false advertising, misrepresentations, and unsafe operation of CATS and the CTC were unfair in that they were immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers in Mecklenburg County, North Carolina.

120. Defendant City of Charlotte false advertising, misrepresentations, and unsafe operation of the Premises were deceptive in that they possessed the tendency or capacity to mislead, or created the likelihood of deception, affecting members of the public including Qualo in Durham County, North Carolina.

121. Defendant City of Charlotte's public advertisements and representations regarding safety policies for visitors, customers, and patrons of CATS and the CTC stated that:

a. "Safety is CATS No. 1 priority,"

b. "The dedicated Office of Safety and Security diligently upholds this commitment every day across all interactions and operations," and

c. "Your safety is not just our number one priority—it's our promise."

122. Qualo selected CATS and the CTC because of its public advertisements and representations that the Premises would be operated in accordance with its publicly advertised safety policies and practices as well as industry standards for safely operating a large transit hub like the CTC.

123. Qualo and other members of the public relied upon and were in fact deceived by Defendant City of Charlotte's false advertising, misrepresentations, and unsafe operation of the Premises in violation of its own policies as procedures and industry standards for safely operating a large transit hub like the CTC.

124. Defendant City of Charlotte's above-described errors, omissions, misrepresentations, false advertising, and breaches constitute unfair and deceptive trade practices that offend North Carolina public policy and are prohibited by N.C.G.S. Section 75-1.1 *et seq.*

125. As a direct and proximate result of Defendant City of Charlotte's above-described errors, omissions, misrepresentations, false advertising, and breaches, Qualo suffered serious and permanent injuries, incurred medical and hospital expenses, suffered excruciating pain, discomfort, and mental anguish, suffered disfigurement and died.

126. Had Qualo lived, he would have been entitled to bring an unfair and deceptive trade practices claim against Defendant City of Charlotte.

127. Plaintiff Dwayne Pennant, as the Administrator of the Estate of Qualo Daniels, has the right to prosecute this claim against Defendant City of Charlotte on Qualo's behalf and is entitled to recover as compensatory damages an amount in excess of $25,000.

128. Plaintiff Dwayne Pennant, on behalf of the Estate of Qualo Daniels, is entitled to treble damages pursuant to N.C.G.S. Section 75-16.

129. Plaintiff Dwayne Pennant, on behalf of the Estate of Qualo Daniels, is further entitled to an award of attorney's fees against and taxed to Defendant City of Charlotte pursuant to N.C.G.S. Section 75-16.1.

## PRAYER FOR RELIEF

Wherefore, Plaintiff Dwayne Pennant, as Administrator of the Estate of Qualo Daniels, respectfully prays the Court that:

a. The Court find the Defendants jointly and severally liable to the Plaintiff;

b. Plaintiff have and recover from Defendants a sum in excess of $25,000.00, with interest, for wrongful death, personal injuries and such other compensatory damages to which Plaintiff is entitled to recover;

c. Plaintiff have and recover from Defendants a sum in excess of $25,000.00 for punitive damages;

d. All costs, interest, and expenses, including reasonable attorney's fees and interest, be taxed to the Defendants;

e. All issues of fact herein be tried by a jury; and

f. For such other and further relief as the Court deems appropriate and just.

This the 12th day of September 2025.

OSBORN LAW PLLC

BY: ________________________________

SANTIAGO ARROBA
N.C. Bar No. 54743
JUSTIN M. OSBORN
N.C. Bar No.41493
S.C. Bar No.100522
712 W. Johnson St.
Raleigh, North Carolina 27603
santiago@osborninjurylawyers.com
justin@osborninjurylawyers.com
T: 919.935.5555
F: 919.573.9559